### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MONTANA

In re

**THERESA CHABOT**,                                  Case No. **08-61317-7**

Debtor.

# MEMORANDUM OF DECISION

At Butte in said District this 13th day of April, 2009.

In this Chapter 13 case, after the Chapter 13 Trustee, Robert G. Drummond, of Great Falls, Montana, filed a motion to convert the case to Chapter 7 (Docket No. 20), Debtor Theresa Chabot ("Theresa" or "Debtor"), of Whitefish, Montana, filed a motion to dismiss under 11 U.S.C. § 1307(b) (Docket No. 21). The Chapter 13 Trustee and Office of U.S. Trustee through the Assistant United States Trustee, Neal G. Jensen, of Great Falls, Montana, both objected and the U.S. Trustee filed a motion to convert the case to Chapter 7 (Docket No. 47) on the grounds the Debtor filed the case in bad faith. Hearings were held on the motions[1] at Missoula on January 15, 2009, and on March 12, 2009. At the conclusion of the parties' cases-in-chief the Court took the motions to dismiss and convert under advisement. After review of the record and applicable law, for the reasons set forth below the Chapter 13 Trustee's and U.S. Trustee's motions to convert will be granted, Debtor's motion to dismiss will be denied, and this case will be converted to a case under Chapter 7 based upon bad faith by the Debtor.

This Court has jurisdiction in this bankruptcy case under 28 U.S.C. § 1334(a). The

---

[1]All three parties filed supplemental motions and supporting materials requesting the same relief as the first motions.

1

pending motions are core proceedings under 28 U.S.C. § 157(b)(2).  This memorandum includes the Court's findings of fact and conclusions of law.

Debtor appeared *pro se* at both hearings and testified.  The Chapter 13 Trustee Robert G. Drummond was represented at the hearing by attorney John P. Paul.  The Office of U.S. Trustee was represented by Assistant U.S. Trustee Neal G. Jensen ("Jensen").   The Montana Department of Revenue ("DOR") was represented at the January 15, 2009, hearing by attorney Teresa Whitney, and DOR's bankruptcy specialist Kim Davis testified at the hearing on January 15, 2009[2].  Bozeman securities dealer Eric Schultz ("Schultz") testified on January 15, 2009. Debtor's spouse Brad Chabot ("Brad") testified at the hearing on March 12, 2009, as did special assistant attorney general Roberta Cross Guns ("Cross Guns") of the Montana State Auditor. Exhibits ("Ex.") 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 34, 35, 36, 49, 51, 52, 55, 56, 57, 58, 59, 60, 61, and 63 were admitted into evidence in the course of both hearings.  This Court took judicial notice of Theresa's four prior bankruptcy cases designated by Case Nos. 00-50655, 03-61787, 04-60156 and 05-62798, by Order entered on January 13, 2009 (Docket No. 88).

## FINDINGS OF FACT

Theresa Chabot is married to Brad Chabot and lives in Whitefish.  Brad testified that they met in Seattle, and have been together since 1990.  They have two minor children.

**Theresa's Work History.**

Theresa has been employed in many different occupations in the last 15 years, including

---

[2]The DOR had joined in support of the motions to convert filed by the Chapter 13 Trustee and U.S. Trustee.  On March 2, 2009, the DOR filed a withdrawal of its joinder (Docket No. 137), stating that the Debtor had filed her state income tax returns.

as a bounty hunter 13 years ago.  She has been involved in oil deals and gold mining deals, but testified that those have not developed.

She stated that she has worked for four securities firms, including in Tempe, Arizona, and for Paine Webber in Portland.  But Theresa denied at the hearing on January 15, 2009, that she has been employed as a stockbroker.  Under questioning by the Court, when asked if she is a stockbroker now Theresa answered:  "No, and I never claimed to be[3]."  At the March 12, 2009, hearing Brad testified that Theresa told him when they met that she was a stockbroker, but that it took her three tries to pass the Series 7 exam.  He testified that Theresa was a stockbroker with Western Capital in Seattle, which traded stocks, that Theresa had an office and that he helped her with cold calls and letters.  He testified that Theresa was a stockbroker until they moved to San Diego, but not after that.

Cross Guns testified that Theresa has never been licensed as a stockbroker or investment broker or advisor.  Cross Guns explained that the securities industry is highly regulated, and that every broker, investment advisor and firm in the industry has to be registered on the national Central Registration Directory ("CRD")[4].  The state auditor has access to the CRD.  Cross Guns testified that its standard practice when receiving a complaint is to search the CRD, and to rely on the CRD to verify if someone is licensed.  If a person is not registered on the CRD then the state auditor considers them not licensed.  Gross Guns testified that they have access to the entire

---

[3]In fairness, Theresa's testimony that she never claimed to be a stockbroker may have been made in the context of the contacts she had with investors in 2008.

[4]Thersa asked Cross Guns whether she contacted the State of Arizona to see whether Theresa was licensed there.  Cross Guns answered that she did not have to because the CRD is a national registry of licensees in each state.

CRD data base back to the 1970's.  In checking the CRD Cross Guns testified that they found Theresa's name listed under her previous name "Erickson", but that Theresa has never been licensed or registered to sell securities or to advise people about securities in any capacity.

Cross Guns was asked about Theresa's Rule 2004 examination testimony, from page 6, where Theresa stated that she took a test and got a license as a stockbroker twenty years ago, and Cross Guns testified that those answers were not true because a person is required to be registered on the CRD or they are not licensed to sell or advise about securities.  Cross Guns testified that in her experience it has never happened that a 20-year old license failed to appear on the CRD.

Theresa testified that she let her stockbroker's license lapse.  Cross Guns testified that even if a license lapses it will still show up on the CRD, even if the licensee is banned for life.  If a license lapses for two years, Cross Guns testified, then the licensee must find another firm to sponsor him or her before retaking the Series 7 license exam.

Theresa showed the Court and Cross Guns a document showing a business card with Theresa Erickson's name issued by L.F. Thompson of Tempe, Arizona, which shows Theresa named as an investment executive.  Theresa stated that she received that card when she started working there on a salary.  Cross Guns responded that the letter head is not persuasive, that in the security industry it is common that employees are given business cards which identify them with titles such as "vice president", and that the salary Theresa was paid was not enough[5] for a stockbroker.  Cross Guns acknowledged that Theresa may have been a sales assistant or a secretary for the brokerage firm.

---

[5]Theresa's W-2 form for 1999 showed a salary in the sum of $6,093.77.

4

Under questioning by the Court about the Series 7 license, Cross Guns testified that the testing authority will send the CRD an applicant's test results stating whether the applicant passed or failed, his or her grade and the name of the sponsoring firm.  Cross Guns testified that no indication exists on the CRD showing that Theresa ever took or passed the Series 7 examination, or that Theresa was sponsored by a firm as required.  Theresa stated that she took the Series 7 examination three times before she passed, and she named the brokerage firms, which she claimed sponsored her.

Theresa admitted doing business under Glacier Financial Inc., but testified that it was dissolved.

**Theresa as "Intermediary" for Eric Schultz.**

Theresa testified that she met Schultz in 2008, and worked as an "intermediary" for Schultz, finding investors and referring them to Schultz.  Theresa later denied that she tried to find investors, but she admitted that she tries to provide financial help to people.

Schultz is a commercial loan broker and runs a private equity fund in Bozeman.  He testified that he began working with Theresa a year and a half ago when someone named Brian Smith from Minnesota referred Theresa to him, seeking to connect a lender with Theresa's in-laws, the Duncans[6].  Both testified that they worked together, and that they communicated several times per week by email and phone.

Schultz described Theresa's duties as an intermediary, which is synonymous with a loan broker, and later testified that her role was mostly communication and that she connected him with investors looking to invest in his high yield investment program.  Schultz testified that

_____

[6]Schultz was unsuccessful at finding a lender for the Duncans.

Theresa had a great network of people she knew, and that she would find investors with at least $100,000 and put them in touch with Schultz.

Theresa testified that people like her and like the way she works. She explained that she talked to people about Schultz's investment program, and came up with contacts "here and there" by talking with people around the country who know other people, but that all she knows is that it involved "T-Bills." Theresa admitted under questioning by the Court that she was not licensed, but she testified that she researched it herself and concluded that Schultz's investment program did not involve securities. Brad testified that Theresa is aware of the concern over being licenses when dealing with securities and careful not to give advice, and that Theresa says that as long as she does not give advice that she is just an "intermediary." Schultz testified that Theresa knew nothing about the nature of his high yield investment program, the amounts of investments or where they were placed, and he testified that his communications with Theresa also covered gold and other programs outside of the investors discussed below[7].

Theresa testified that she referred a total of 8 persons to Schultz who invested a total amount of approximately $900,000. Schultz testified that eight individuals referred by Theresa invested money with his investment program in a total amount of $1,045,000, but that $0 of that total remains and no profit was earned. He testified that investors called him and Theresa about the investment returns, and that he spoke with her about the returns.

Theresa testified that Schultz paid her approximately $50,000 in 2008 for one client, but she did not retain her fee agreements. She had a verbal agreement to split fees with persons who

---

[7]He testified that people approached him seeking loans and offering gold and other assets as security, and they then wanted to invest the loan proceeds in his high-yield programs.

work with her on loans.  She testified that Schultz worked with a North Carolina attorney in his investment program, and that Schultz gave his investors a guarantee.

She testified that Schultz had the investment documents, and that she did not know as much about the investment program as Schultz.  Schultz testified that he gave the investment documents and information to law enforcement, and provided the Office of U.S. Trustee with Ex. 1 through 48.

Several investment documents were admitted into evidence, and their material terms are discussed below.  Theresa testified that Schultz had a "sincere interest to help humanity" and that his investment vehicles were intended to generate funding to protect animals and improve hospitals and schools[8].

Ex. 3 is a facsimile ("fax") to Theresa from Lawrence F. Rovi ("Rovi") dated June 21, 2008, of a non-disclosure and working agreement, signed by Rovi and by Schultz as president of Big Sky Equity, Inc. ("Big Sky Equity").  Ex. 3 includes Bank of America documents, including a client evaluation summary of Rovi.  Schultz told the state auditor that Theresa introduced him to "Investor 18," which appears to be Rovi.  Ex. 52, p. 29, item 107.

Ex. 1 is a fax to Theresa from Rovi on July 1, 2008.  Ex. 1 includes a "Performance Guarantee Agreement" ("Guarantee"), dated June 24, 2008, whereby guarantor Big Sky Equity, with Schultz signing as president, guaranteed full and prompt repayment to Rovi of Matilani, Inc. ("Matilani") of the sum of $100,000 in the event of nonperformance.   Ex. 2 is a fax to Theresa

---

[8]Ex. 29 is an executive summary for a proposed children's hospital/medical facility in Richmond, Virginia, under the heading "Sabian's Hope Foundation."  This particular entity is identified in Ex. 52 as "Investor 17" at page 28, who appears to be David Rickard of JDS Bath Systems, Inc.

from Rovi on July 1, 2008, including an agreement dated June 24, 20808, between Big Sky Equity, signed by Schultz as president, and Matilani signed by Rovi, whereby Schultz guaranteed payment to Rovi and Matilani (the "Beneficiary") of a "distributional interest" in the sum of $1,375,000.00 after a period of eight weeks, by September 6, 2008, and the Beneficiary agrees to pay Big Sky Equity, Inc., a consultancy fee of $100,000 without delay.

Ex. 4 is an "Irrevocable Fee Agreement/Pay Order" ("IFA"), dated June 24, 2008, guaranteeing payment by Rovi and Matilani (the "Investor") to "Intermediaries" identified as Theresa, Anna's Kitchen and Faith Enterprises, LLC[9], of "consultancy fees" calculated at twenty percent (20%) of the "net returned distributional interest payment/investment amount," which Theresa testified meant 20% on the profit.  She testified that the intermediaries would split the $20,000 three ways under Ex. 4.  The IFA states that the Intermediaries are independent contractors.  Ex. 4 designates an escrow attorney identified as Barbara Ann Johnson-Stokes ("Johnson-Stokes"), whose attorney trust account was in Commerce Bank in Cherry Hill, New Jersey.  Theresa testified that Johnson-Stokes is a friend of Dwayne Nixon, who Theresa knows.  She testified that she has a verbal agreement with Johnson-Stokes, wherein the intermediary fees would be deposited in Johnson-Stokes' attorney trust account, and then would be distributed to intermediaries.

Ex. 5 is an amendment to the IFA between Big Sky Equity and Rovi dated 09/09/2008, amending the IFA with regard to the time, funding amount, procedure and acknowledgment[10].

---

[9]Theresa identified Jan Chastain as president of Faith Enterprises, LLC.

[10]The reason given on page 1 of Ex. 5, Recitals, is:  "Due to uncontrolled and unforeseen circumstances and intermediaries project funding trader's health and a shortage of trade instruments or MTN's ...."

Ex. 5 creates a limited joint venture between the parties in the amount of $100,000, protected by the Guarantee. Rovi's initial $100,000 was to be returned within 2 weeks of the date of Ex. 5, and within 30 days of Ex. 5 Rovi, as Beneficiary, would receive a "distributional interest" in the amount of $1,375,000.00. Rovi faxed Ex. 5 to Theresa, Ex. 6, and she testified she sent it to Schultz. When asked whether the high rate of return on these investments concerned her, Theresa testified that she routinely deals with people with large funds. Ex. 7 was signed by Rovi dated June 21, 2008. Theresa testified that Ex. 7 is Rovi's verification of the source of the funds, and that someone does an FBI background check on investors, but she does not know how.

The second investor discussed is The Wayne Group, LLC ("Wayne Group"), Ex. 8[11]. Theresa testified that the same documents were used, but that she did not prepare the documents and she makes money only if the people invest. Ex. 8 is signed by the Wayne Group's CEO/president Anthony Evelyn, and states that the Wayne Group had placed $100,000 with Big Sky Equity. Ex. 9 is a client evaluation summary and verification of the $100,000 investment signed by Evelyn for the Wayne Group, dated June 22, 2008.

Ex. 11 is an investment agreement, similar to that in Ex. 2, between Big Sky Equity and the Wayne Group dated 06/24/2008[12]. Ex. 11 provides for payment of an irrevocable consultancy to Big Sky Equity in the amount of $100,000, and for distributions to the Wayne Group of the sum of $1,375,000.00 after 8 weeks of the "private capital management program." Ex. 12 is an IFA between the Wayne Group and intermediaries Theresa, Faith Enterprises, and

[11]Ex. 8 is the Wayne Group's "Executive Simmary" [sic].

[12]Ex. 14 is an email from Theresa to Schultz dated June 23, 2008, forwarding Anthony Evelyn's banking information.

9

Anna's Kitchen dated June 24, 2008, providing for payment to the intermediaries of 20% of the investment amount.  Theresa testified that she was to share that 20% with Faith Enterprises and Anna's Kitchen.  Ex. 13 is Big Sky Equity's Guarantee of the $100,000 investment to the Wayne Group, similar to Ex. 1.

Ex. 17 is an investment agreement like Ex. 2, dated 06/06/2008 between Big Sky Equity and RG Norling & Associates ("Norling"), for the investment of $200,000 by Norling, a consultancy fee to Big Sky Equity in the sum fo $200,000, and a distribution to Norling in the sum of $4,000,000 after 8 weeks of Big Sky Equity's private capital management program by September 6, 2008.  Theresa testified that she located Norling through her own contacts, and that Norling wanted to establish a low income housing program.  Jensen asked Theresa whether such a high rate of return of an investment in an 8 week period, from $200,000 to $4,000,000, strikes her as odd and she answered that she disagreed, and considered the return "conventional."  Ex. 19, dated 06/06/2008, is an IFA signed by Norling for intermediaries Theresa, Jan Chastain, Wayne McLean, and Vernon Coleman, for payment of an irrevocable consultancy fee of 20% of the net returned distributional interest payment/investment amount.

Ex. 34, 35, and 36 are documents involving David Rickard ("Rickard") and his entities JDS Bath Systems, Inc., and JDS Properties, LLC, Inc.  Theresa testified that Rickard was an investor and leader of an investment group, and that she spoke with Rickard only once.  Schultz told the state auditor that Theresa introduced him to Rickard.  Ex. 52, p. 28, item 102.  Ex. 35, dated July 30, 2008, states Rickard's interest in investing $150,000 in a private placement investment opportunity.  Ex. 36, dated 09/09/2008, is an amendment to an IFA between Rickard of JDS Properties, LLC, Inc., and Big Sky Equity, forming a limited joint venture in the amount

10

of $140,000 of investment by JDS, and payment to JDS of $2,800,000 within 30 days.

Ex. 18 is an amendment to Ex. 17, dated 09/09/2008, due to "uncontrolled and unforeseen circumstances", between Big Sky Equity and Norling, creating a joint venture between them for investing $200,000, repaying Norling the initial $200,000 deposit, and paying a reduced distributional interest to beneficiaries in the sum of $2,500,000 within 30 days.

Ex. 27 is an investment agreement similar to Ex. 2 dated 05/27/2008, between Big Sky Equity and Executive Financial Investments, Inc. ("Executive Financial") providing for an investment investment by Executive Financial in the amount of $100,000, payment of an irrevocable consultancy fee in the same amount to Big Sky Equity, and payment of a distributional interest to Executive Financial after 8 weeks of the private capital management program in the amount of $1,000,000, with one payment of $500,000 on June 30, 2008, and a second payment of $500,000 on July 30, 2008. Ex. 28 is Big Sky Equity's performance guarantee for the $100,000 investment by Executive Financial in Ex. 27. Schultz told the state auditor that Chabot introduced him to "Investor 14." Ex. 52, p. 26, item no. 90.

Ex. 22 is an investment agreement similar to Ex. 2 dated 06/28/2008 between Big Sky Equity and Executive Financial, for an investment by Executive Financial in the amount of $400,000, payment of an irrevocable consultancy fee in the same amount to Big Sky Equity, and payment of a distributional interest to Executive Financial after 8 weeks of the private capital management program in the amount of $8,000,000 on September 6, 2008. Theresa testified that she and the other intermediaries were paid twice on this agreement, in a total amount of $100,000.

Ex. 23 is an amendment dated 09/09/2008 to the agreement between Executive Financial

11

and Big Sky Equity, similar to Ex. 5, creating a joint venture for a transfer of $100,000, and

payment to Executive Financial of a distributional interest in the amount of $1,375,000 within 30

days.  Ex. 23 includes a client evaluation of Executive Financial's president Anna Dyasi

Guardado ("Guardado") of Los Angeles[13], California, and verification of Executive Financial's

source of funds.  Guardado appears to be "Investor 20" identified in Ex. 52, p. 31, item no. 115,

which states that Schultz told the state auditor that he was introduced to Investor 20 by Theresa.

Ex. 26 is an addendum to the IFA signed by Executive Financial's president Guardado, Theresa,

and Faith Enterprises providing for payment to Johnson-Stokes for escrow attorney services in

the amount of one tenth of 1% of the net returned, distributional interest payment/investment

amount.  Theresa testified that Guardado of Executive Financial decided to invest the $400,000

and to "keep it rolling."

Theresa received wire transfers from Guardado shown on the bank statements for her

company Glacier Financial, Inc., in Ex. 49.  Theresa testified that she received a payment of

$15,000 from Schultz shown on 8/11/08, received another wire transfer from Schultz and

Guardado in the amount of $37,500 on June 30, 2008, and received a wire transfer from

Guardado in the amount of $30,300, shown on Ex. 49 as received on 8/15/08, which she shared

with the three other intermediaries.

Big Sky Equity did not accept money from everyone who sought to invest.  Theresa

testified that money offered for the private placement investment by John Trebesch was

fraudulent and was not accepted[14].  Schultz testified that he was contacted by the United States

---

[13]Her passport country of issue is stated on Ex. 23 as El Salvador.

[14]Ex. 41 was not admitted.

Postal Inspector which informed him that the $300,000 offered from potential investors Ramsay and Trebesch was fraudulent, and it seized that $300,000.  Ex. 15 and 16 are investment documents and part of an IFA signed by Alexander Bogach of Desert Preservation, Inc., of Glendale, Arizona, for the investment of $100,000 to Big Sky Equity's investment program. Theresa testified that Shultz determined that this investor's money was not acceptable.

Of the $1,045,000 actually invested, Schultz testified that $740,000 went into diversified equities, real estate, his own personal use, and to payment of intermediary fees.  Ex. 52, p. 34, item no. 126.  He testified that Theresa was not part of the investment plan and was not aware what he did with the money.

Schultz testified that $200,000 was paid to Dan Two Feathers[15] ("Two Feathers") of Missoula, which went into an account in the Bank of Bermuda where it was frozen[16].  Schultz sent another $200,000 of the $740,000 to the paymaster Johnson-Stokes in New Jersey for payment of intermediary fees, and sent $50,000 to Global Holdings Group, LLC ("Global Holdings").  Ex. 52, p. 33, item 123.  He testified that he told Theresa that he paid the intermediaries with the $200,000, and that his son told Theresa that Schultz talked to Global Holdings.  On cross examination Theresa asked Schultz if he had informed her and the other intermediaries that the funds they were paid with came from the clients' funds instead of from profits.  Schultz answered "No" and that he told her that funds from the investors were available,

---

[15]Ex. 52 at page 4 describes Two Feathers, a/k/a Dan Latham, as a felon who was convicted in federal court in 1999 of conspiracy to defraud the United States, money laundering and creating or using fictitious obligations.  He served approximately 41 months in federal prison.

[16]He testified that one person in Bermuda was arrested in conjunction with the frozen account.

13

so he met his time obligations to pay.  Brad testified that Theresa and Brad thought that Theresa was being paid from the profits, not from the investors' investments.  Schultz testified that the $200,000 he sent to Johnson Stokes for distribution to Theresa and other intermediaries was not paid from profits of the investments, but came from the $740,000.  He testified that his arrangement with Theresa was that she be paid 20% from profits, but that no profit was made.

The Montana State Auditor commenced an agency action against several parties, including Schultz and Big Sky Equity, for violation of Montana securities laws.  Cross Guns testified that the investigation commenced in 2008 after a woman in Texas filed a complaint. The state auditor investigated, and learned of victims from Switzerland, Australia, and other countries besides the USA.  The state auditor's first defendant was Two Feathers.  Ex. 52 was admitted into evidence as a certified copy of the "Third Amended Notice of Proposed Agency Disciplinary Action and Opportunity For Hearing" field in Case No.: SEC-2008-65 1-10-08-280 before the State Auditor; Ex-Officio Commissioner of Securities and Insurance.

Schultz testified that the Third Amended Notice, dated January 12, 2009, added Teresa and Global Holdings as respondents.  Cross Guns testified that they joined Theresa in the Third Amended Notice after Schultz gave the state auditor documents showing that Theresa acted as an intermediary and advised people to invest with Schultz, that Theresa is not licensed as an investment advisor, and that Theresa admitted receiving payment for advising seven people to invest.  In Ex. 52 the state auditor accuses Theresa of violations of Montana securities laws at page 49, item 77 (MCA § 30-10-201), and page 55, item nos. 110, 111, and 112.

Shultz testified that he has taken small investments and produced big returns, but he testified that he cannot explain how his investment programs would accomplish the high yields

14

offered.  Schultz has never been registered in any capacity with the Montana Securities

Department.  Ex. 52 provides an explanation of the high yield investment program at page 22.

The investment plan offered substantial investment return on "safe US Treasure notes"

which were actually US Treasury STRIPS[17].  Ex. 52 pp. 7, 22.  At least one investor was told that

the incredible short term profit offered by Schultz and Two Feathers was to be created "from the

continual buying and selling" of US Treasury STRIPS.  Ex. 52, p. 10, paragraph 21.  Ex. 52

states at p. 22 that Schultz invested $200,000 of the $740,000 in capital he raised in the

investment platform promoted by Two Feathers.

**Theresa's Prior Bankruptcy Cases.**

Theresa testified that the instant Chapter 13 case is the fifth bankruptcy case she has filed.

The Court's CM/ECF system shows that Theresa filed Case Nos. 00-50655-7, 03-61787-13, 04-

60156-13, and 05-62798.

Case No. 00-50655-7 was a joint case Theresa filed pro se with Brad.  It was a no asset

case closed after entry of discharge with the Trustee's consent on October 3, 2000.  Case No. 03-

61787-13 was an individual Chapter 13 case filed by Theresa on June 2, 2003.  At the time

Theresa listed her address as 125 Lidstrom, and her Schedule D listed Washington Mutual

("WaMu") as holding a secured claim against that residence.  That case was dismissed upon

Theresa's motion, after the Chapter 13 Trustee moved to dismiss, and a final decree was entered

on September 29, 2003.

Case No. 04-60156-13 was an individual Chapter 13 case filed by Theresa on January 26,

---

[17]Ex. 52 explains at page 7, footnote 4 that STRIPS is an acronym for separate trading of registered interest and principal of securities.  STRIPS are special issues of US Treasury zero-coupon bonds which are created and sold by brokerage firms, not by the government.

2004.  It was dismissed on the Chapter 13 Trustee's motion after a hearing, but the Court denied

the Trustee's request for dismissal with prejudice and a 6 month bar against refiling[18].  In that

case Theresa's Schedule A lists no real property and Schedule D lists no secured creditors, but

her Plan listed Long Beach Mortgage as a creditor with an impaired secured claim.

Case No. 05-62798 was an individual Chapter 13 case filed by Theresa, which was

converted to Chapter 7 on Theresa's motion after WaMu filed a motion for relief from the stay

and in rem relief.  WaMu's motion was consolidated with Adversary Proceeding No. 05-00128.

Theresa waived her discharge in a compromise with the U.S. Trustee.  In Adv. No. 05-00128 the

Court entered proposed findings of fact and conclusions of law on May 10, 2007, dismissing all

of Theresa's claims for relief against WaMu and granting its motion to modify the stay.  The

district court adopted all of this Court's findings and conclusions and entered judgment in favor

of WaMu and against Theresa on November 13, 2007, dismissing all her claims for relief[19].

Theresa appealed the district court's judgment to the Bankruptcy Appellate Panel, which returned

it to the district court for lack of jurisdiction, so the judgment is final.  Adv. No. 05-00128 was

closed on February 11, 2008.

**Case No. 08-61317-13.**

Theresa filed her voluntary Chapter 13 petition pro se, commencing the instant case on

September 23, 2008, with her Schedules and Statement of Financial Affairs, but no Chapter 13

---

[18]Theresa's attorney agreed to a 30 day suspension from practice and disgorgement of his fees as part of a settlement with the U.S. Trustee in Case No. 04-60156-13.

[19]The proposed findings of fact and conclusions of law are at Docket No. 61 in Adv. No. 05-128.  Theresa's complaint included nine counts alleging violations of state and federal statutes, fraud, unconscionable contract and usury by WaMu.

16

Plan has been filed.  She testified that she thought her Schedules of current monthly income and expenses, Schedules I and J, constituted a plan.  She testified that she and her sister-in-law filed their petitions together.

Theresa signed her declarations "under penalty of perjury" declaring that the information provided in her petition is true and correct and that she read her schedules and that they are true and correct to the best of her knowledge, information and belief.

Schedule A lists Debtor's family residence at 125 Lidstrom Rd. in Whitefish, Montana.  It is listed with a current market value of $345,000 and subject to a secured claim in the amount of $550,000.  Theresa amended her Schedule A and removed the secured claim (Docket No. 95).

Schedule B, item no. 2 asking for accounts at financial institutions lists "Cash-Bank" in the amount of $750.00.  Theresa testified that she has two accounts at Parkside Federal Credit Union ("FCU") in Whitefish.  Cross Guns testified that none of the money Theresa received from Schultz from the investors' money is included on Theresa's Schedules.

Item no. 16, calling for accounts receivable, is marked "None" on Debtor's original Schedule B.  On January 14, 2009, Debtor amended her Schedule B and listed "$400,000 Proof of Claim – Duncan[20]" with a current value of $200,000.  Theresa testified that she feels the Duncans owe her, but that they cannot afford to pay.  She testified that her father- in-law Greg Duncan lived with her for more than a year until August 2008, during which he contributed to

---

[20]The Gregory B. Duncan and Laurie L. Duncan are Theresa's in-laws.  They filed a Chapter 11 case, No. 07-61053, which was converted to Chapter 7.  Theresa filed Proof of Claim No. 27 on October 15, 2008, asserting a priority claim in the amount of $400,000 for compensation for services performed from 7-8-2007 to the present.  Attached to her claim is an IFA signed by Gregory B. Duncan containing language substantially similar to the IFA's shown on Ex. 4 and other exhibits.

Theresa's household expenses.  She testified she received $4,700 per month from Greg Duncan, and that over the years she received between $30,000 to $40,000 from the Duncans, mostly in cash, including some received after Duncans filed their own bankruptcy case.  She testified that Duncans paid her attorney fees.

Schedule B at item nos. 18, 20, 21 calling for liquidated and unliquidated claims, are marked "None."  Theresa testified that she feels she has claims against three attorneys and against WaMu.  Schedule B lists a 2005 Dodge Truck and a 2003 Chevy Tahoe, and no other vehicles.  She amended her Schedule B to list a 1988 Chevy Truck, and she testified that she thought she listed the 1988 truck on her schedules and did not know how it was omitted, but she did the best she could.

Schedule D lists WaMu with a claim against the family residence in the amount of $550,000.  She amended Schedule D to list WaMu's claim as disputed and the entire amount as unsecured in the amount of $570,000.

Schedule F lists a total of $48,154 in unsecured nonpriority claims.  Cross Guns testified that she reviewed Theresa's Schedules and found that none of the investment victims are listed, and neither is Schultz.  Cross Guns claims that both the investors and Schultz have claims against Theresa because they incurred losses due to Theresa's activities.  Schedule H lists no codebtors, but Schedule D lists a joint car loan on the 2003 Chevy Tahoe.

Debtor's Schedules I and J show a negative monthly net income in the amount of -$668.  Schedule I states that her employer is "self" and that she is occupied in "financial."  Her income is stated in the amount of $5,300 per month, and no income is listed for her spouse.  Schedule J lists her expenses in the amount of $5,968, including $3,050 per month for her mortgage.

Theresa testified that she has made possibly three mortgage payments to WaMu over the life of the loan, but she does not think that she has made a payment to WaMu since 2002.

Debtor's Statement of Financial Affairs ("SOFA") states that her 2008 income from operation of business is $50,000. She testified that she estimated that $50,000 from what she earned from Schultz. When asked about her bank statements showing $103,900 in 2008 receipts, Theresa testified that some of that came from her father-in-law Duncan and was not her income. She testified she paid his bills for him.

Her SOFA states "None" at question no. 4 ("Suits and administrative proceedings . . ."), which calls for the debtor to list all suits to which the debtor is or was a party within one year immediately preceding the filing of the bankruptcy case. Theresa testified that she thought the question asked if she was a creditor in a suit.

JPMorgan Chase Bank, as mortgage loan servicer ("JPMorgan") filed Proof of Claim No. 5 on October 15, 2008, asserting a secured claim in the amount of $567,027.38, secured by real estate and based upon a note and deed of trust dated March 25, 2002, payable to Long Beach Mortgage Company. Debtor filed objections to Claim No. 5 (Docket Nos. 36/156), and a second hearing[21] is scheduled on the Debtor's objection to JPMorgan's claim is scheduled for April 16, 2009.

The Trustee filed a motion for turnover of books and records on October 27, 2008, which the Court granted. Theresa filed a motion to extend time to turn over documents for 45 days, and

---

[21]The first hearing on Debtor's objection to JPMorgan's claim was held on March 12, 2009, where it was taken under advisement. Debtor filed her second objection on March 16, 2009, with her order to compel production of documents. JPMorgan filed a response and additional exhibits seeking to establish that it is the proper holder to enforce its claim (Docket No. 164), and setting a second hearing on the Debtor's objection for April 16, 2009.

then filed a motion to dismiss.  This Court granted the motion to dismiss, which was later

vacated on reconsideration by Order entered on December 11, 2008, but no order was entered on

Debtor's motion for extension of time.  Theresa testified that she turned over documents to the

Trustee.[22]

Through mutual friends Theresa met a person named Denny Hardin ("Hardin"), who she

identified as a "common law attorney."  Theresa testified that she received Ex. 51 from Hardin,

and that Hardin is her "Agent."  Ex. 51 is dated December 21, 2008, and in it Hardin asserts on

the second page that he has established himself as a "Private Bank" with a $101,000,000.00

account in the Federal Reserve Bank of New York upon which "Bonded Promissory Notes" can

issue for the payment of debt, as legal tender[23], for a $100 fee[24].  Theresa testified that Hardin

sent one of his bonded promissory notes to WaMu[25], and she answered "Yes" when Jensen asked

if that bonded promissory note paid WaMu in full for her home mortgage.  Asked a second time

about Hardin's note Theresa testified that she believed that would pay WaMu in full, and that if it

---

[22]When asked about vehicle titles Theresa answered that she turned them over, except the
title to a 1988 Chevy truck which she testified she does not have.  Theresa filed a response on
February 2, 2009, which includes a copy of the 1988 Chevy truck.

[23]Theresa described one incident in which Citibank accepted a debt paid in full upon
receipt of a payment from Hardin.  The Court sustained the U.S. Trustee's objection and refused
admission of Ex. A.

[24]Theresa testified that Hardin wants to help people.  She testified that in the Duncan
bankruptcy, Case No. 07-61053-7, Hardin sent a bonded promissory note to pay off the mortgage
on the Duncans' home on Whitefish Lake, but that it was too late because the Trustee had already
seized the property.

[25]Debtor's motion (Docket No. 35) states that Hardin sent JPMorgan a bonded promissory
note delivered on October 30, 2008.  The day before the March 12, 2009, hearing Theresa filed a
notice of her withdrawal of Hardin's bonded promissory note (Docket No. 152).

works she may send bonded promissory notes to all of her creditors.[26]

Ex. 63 is a document from Hardin titled "Notice and Demand" in which Hardin accuses the Federal Bureau of Investigation of robbing Hardin's bank pursuant to a search warrant issued by a federal magistrate.  Ex. 55, 56, 57, 58, 59, 60, and 61, attached to Docket No. 84, are certified copies of case dockets and other documents from the U.S. District Court for the Western District of Missouri, which the U.S. Trustee offered to establish Hardin's litigiousness against persons in authority.

Ex. 55 is the docket for Case #: 4:08-mc-09027-FJG, initiated by Hardin on 11/6/2008, describing a search of Hardin's premises.  Ex. 56 is a docket for Case #: 4:07-cv-00754-DW, initiated by Hardin against the State of Missouri, its governor, and various judges.  Ex. 57 is the docket for Case #:  4:92-cv-00730-DW by Hardin and others against the Jackson County Drug Enforcement Task Force, in which the court's dismissal was affirmed on appeal by the Eighth Circuit Court of Appeals shown by Ex. 61.  Ex. 58 is the docket for Case #:  4:98-cv-00158-FJG by Hardin, in which the court's dismissal was affirmed on appeal to the Eighth Circuit Court of Appeals shown by Ex. 60.  Ex. 59 is the docket for Case #: 4:94-cv-00049-FJG by Hardin against the USA, Missouri, several judges and other defendants, in which the case was dismissed with prejudice.

Theresa attended her § 341 meeting of creditors, where she was asked about her paperwork and records.  She testified that she produced her 2008 bank statements which were all

---

[26]The Court observed at the January 15, 2009, hearing that Hardin's bonded promissory notes are "bogus," that the Court would not allow payment of any debt by such means, and warned Theresa that Hardin will only cause her heartache.  Theresa testified that she is willing to try to pay off WaMu with a bonded promissory note as long as it's not illegal, and that she intends to proceed against WaMu in state court if her case is dismissed.

that she had, that she does not have a general ledger, that she has no records on her computer, and that she does not retain documents and deletes anything from her computer if it is too personal. The Court ordered the Debtor on January 15, 2009, to turn over her computer hard drive to the U.S. Trustee and she complied.

The DOR joined in the motions to convert because of the Debtor's failure to file her individual state income tax returns for several years. Davis testified on January 15, 2009, that Theresa's state tax returns had been missing for the years 2000, 2001, 2003, 2004, 2005, 2006 and 2007, until shortly before the hearing. Davis testified that just before the hearing Theresa sent in returns for the years 2000, 2001, 2003 and 2004, all of which were unsigned and undated and had no schedules or statements but included checks totaling $62. Theresa testified that she does not owe the State of Montana any taxes after she sent the DOR $62. After the Court ordered Theresa to file all overdue tax returns (Docket No. 101), the Debtor refiled her Montana tax returns. Thereafter the DOR withdrew its joinder to the motions to convert (Docket No. 137).

The Internal Revenue Service ("IRS") filed Proof of Claim No. 9 on January 7, 2009, asserting an estimated priority claim in the amount of $24,972.55 due to Theresa's failure to file federal income tax returns for the years 2005, 2006, and 2007. Theresa filed a motion on February 2, 2009 (Docket No. 114) which states at the bottom of page 3 that she "has filed both her Federal and state income taxes, showing that there are no newly acquired income taxes." To date the IRS has not filed an amended claim.

The Chapter 13 Trustee withdrew his motion for contempt (Docket No. 74) on March 2, 2009 (Docket No. 138). The U.S. Trustee withdrew its motion for contempt (Docket No. 68) on

March 9, 2009 (Docket No. 145), after the Debtor turned over her computer.

Theresa testified that she wants her case dismissed, and that she will work something out
and raise money to pay her creditors.  She testified that WaMu was willing to work out a
payment plan, as shown by its letter dated September 18, 2008, in Ex. 49[27].

## DISCUSSION

### I.  Contentions of the Parties.

Theresa argues that her case should be dismissed, not converted to Chapter 7, because she
has an absolute right to dismiss and no bad faith has been shown.  She contends that Hardin's
bonded promissory notes are irrelevant because that took place postpetition.  She argues that she
has been unable to find counsel, and that the reason she did not appear at the creditors' meeting is
because she believed the case had been dismissed.  She blames her prior bankruptcy attorneys for
the problems in her earlier cases, and accuses Jensen of misleading the Court, acting in bad faith,
false allegations, and harassment against her.

The Chapter 13 Trustee's motion to convert (Docket No. 20) is based on Theresa's failure
to file a plan, failure to turn over documents and to comply with the Court's Order to turnover,
and failure to appear at the § 341 meeting of creditors.  The Trustee's objection to Debtor's
second motion to dismiss (Docket No. 142) accuses Theresa of abuse of the bankruptcy process,
and contends that she is not an "honest but unfortunate" debtor.

The U.S. Trustee's first motion to convert (Docket No. 47) cites the same grounds as the
Chapter 13 Trustee's motion, plus Theresa's tender of Hardin's bonded promissory note to

---

[27]The first page of Ex. 49 discusses a repayment plan, but states that "if you do not fulfill
the terms of the repayment plan it is void, and default procedures will resume."

JPMorgan in full payment of her mortgage, her serial bankruptcy filings, the undisclosed claim she filed in the Duncan Case No. 07-61053 asserting she is owed $400,000 and her attempt to withdraw that claim, her failure to file state and federal tax returns, and her actions as a bankruptcy petition preparer.  The U.S. Trustee argues that conversion to Chapter 7 is in the best interests of creditors so that the truth of her financial dealings can be revealed and her creditors paid.  The U.S. Trustee's amended motion adds the allegations of unlicensed securities fraud against Theresa filed by the Montana State Auditor, and argues that a full investigation of Theresa's past financial transactions can best be accomplished in a Chapter 7 case if any defrauded investors exist with claims against her.

In a joint report prepared by the U.S. Trustee (Docket No. 120), the Trustee and U.S. Trustee list several categories of documents turned over by Theresa, along with her computer, but also list a vehicle title, signed tax returns and bank statements and other documents which have not been produced.  Theresa filed another response, renewed motion to dismiss and additional documents (Docket Nos. 127 & 135), which were followed by the Trustee's and U.S. Trustee's withdrawal of their motions for contempt.  They continue to ask for conversion of the case to Chapter 7.

**II.  Dismissal/Conversion – 11 U.S.C. § 1307.**

Sections 1307(b) and 1307(c) provide as follows:

(b) On request of the debtor at any time, if the case has not been converted under section 706, 1112, or 1208 of this title, the court shall dismiss a case under this chapter.  Any waiver of the right to dismiss under this section is unenforceable.

(c) . . . [O]n request of a party in interest, or the United States trustee and after notice and a hearing, the court may convert a case under [chapter 13] to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is

in the best interests of creditors and the estate, for cause . . . .

  *See Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 771 (9th Cir. 2008).

In *Rosson* the Ninth Circuit noted that the conflict between § 1307(b) and (c) divided

courts, with some courts holding that a debtor has an absolute right to convert while others hold

that a bankruptcy court has the power to convert a case under § 1307(c) even when a debtor

requests dismissal under § 1307(b). *Rosson*, 545 F.3d at 771. That conflict is now resolved.

The right to dismiss under 11 U.S.C. § 1307(b) is no longer absolute, as contended by Theresa,

but rather is qualified by an implied exception for bad-faith conduct or abuse of the bankruptcy

process. *Rosson*, 545 F.3d at 767, 773-74; *Marrama v. Citizens Bank of Massachusetts*, 549 U.S.

365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). This Court's Order (Docket No. 28) dismissing

the case was entered in error on the same date Debtor filed her motion to dismiss, without notice

or hearing, and therefore it was vacated in accordance with *Rosson* and *Marrama* (Docket No.

37).

The Court in *Marrama* did not decide with precision what qualifies as bad faith, but

emphasized that the debtor's conduct must in fact be atypical. *Rosson,* 545 F.3d at 773, quoting

*Marrama,*127 S.Ct. at 1112 n.11. The Ninth Circuit in *Rosson* cited its decisions in *Leavitt v.*

*Soto (In re Leavitt)*, 171 F.3d 1219, 1222-23 (9th Cir.1999) and *Eisen v. Curry (In re Eisen)*, 14

F.3d 469, 470 (9th Cir. 1994) (per curiam), that a finding of bad faith is a finding of fact

reviewable for clear error. *Rosson*, 545 F.3d at 774.

In determining whether a petition or plan is filed in good faith the court must review the

"totality of the circumstances." *Leavitt* , 171 F.3d at 1224-25; *In re Gress*, 257 B.R. 563, 567, 19

Mont. B.R. 30, 34 (Bankr. D. Mont. 2000); *In re Eisen*, 14 F.3d 469, 470 (9th Cir. 1994). In

25

affirming this Court's dismissal of a Chapter 13 case with prejudice, the district court in this

district has adopted the *Leavitt* "totality of the circumstances" list of factors. *In re Kreilick*, 18

Mont. B.R. 419, 421-22 (D. Mont. 2000); *In re Hungerford*, 19 Mont. B.R. 103, 130 (Bankr. D.

Mont. 2001).

A finding of bad faith does not require fraudulent intent by the debtor. *Hungerford*, 19

Mont. B.R. at 130; *Gress*, 257 B.R. at 568:

This Court noted in *Gress*:

A finding of bad faith does not require fraudulent intent by the debtor.

> [N]either malice nor actual fraud is required to find a lack of good faith.
> The bankruptcy judge is not required to have evidence of debtor illwill
> directed at creditors, or that debtor was affirmatively attempting to
> violate the law-malfeasance is not a prerequisite to bad faith.

*In re Powers*, 135 B.R. 980, 994 (Bankr.C.D.Cal.1991) (relying on *In re
Waldron*, 785 F.2d 936, 941 (11th Cir.1986)).

The determination of whether a debtor filed a petition or plan in bad faith so as to
justify dismissal for cause is left to the sound discretion of the bankruptcy court.
*In re Leavitt*, 171 F.3d at 1222-23; *In re Marsch*, 36 F.3d 825, 828 (9th Cir.1994);
*Greatwood v. United States (In re Greatwood)*, 194 B.R. 637, 639 (9th Cir. BAP
1996), aff'd, 120 F.3d 268 (9th Cir.1997).

The same factors govern whether Gress filed his petition or his plans in bad faith.
*In re Eisen*, 14 F.3d at 470; *In re Leavitt*, 171 F.3d at 1224.

257 B.R. at 568; *Greatwood v. United States (In re Greatwood)*, 194 B.R. 637, 639 (9th Cir. BAP

9th Cir.1996), *aff'd*, 120 F.3d 268 (9th Cir.1997). Thus, this Court has the discretion to dismiss

this case with prejudice for bad faith, or to convert the case to Chapter 7 as the Trustee and U.S.

Trustee request.

In *Leavitt*, 171 F.3d at 1224, the Ninth Circuit held that in determining whether a chapter

13 plan was proposed in good faith, a bankruptcy court should consider (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. *See also In re Cavanagh*, 250 B.R. 107, 114 (9th Cir. BAP 2000).

After considering the *Leavitt* factors and the evidence in this case, the Court concludes that Theresa filed her petition in bad faith, and that the evidence shows that conversion of the case to Chapter 7 is in the best interests of creditors and the estate.

The first *Leavitt* factor is whether the debtor misrepresented facts in her petition or plan, unfairly manipulated the Code, or otherwise filed her petition or plan in an inequitable manner. The Court finds that the Trustee and U.S. Trustee have satisfied their burden of proof to show that the first *Leavitt* factor shows bad faith by a strong preponderance of the evidence. Theresa filed her Chapter 13 case, and to date has not filed a plan in violation of 11 U.S.C. § 1321, which provides: "The debtor shall file a plan." Section 1307(c)(3) lists failure to file a plan timely as grounds for conversion or dismissal. Debtor's argument that she thought her Schedules I and J comprise a plan is without merit. Furthermore, her Schedule J shows a monthly loss in the amount of $668, which shows that she never had the means to make any plan payment, as indeed she has not.

Debtor argues that she has been unable to find counsel. In the Ninth Circuit, pro se litigants are not excused from compliance with the rules. *Warrick v. Birdsell*, 278 B.R. 182, 187 (9th Cir. BAP 2002). Ignorance of court rules does not constitute excusable neglect, even if a litigant appears *pro se. Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir. 1997)

(*quoting Swimmer v. IRS*, 811 F.2d 1343, 1345 (9th Cir. 1987)); *King v. Atiyeh*, 814 F.2d 565,

567 (9th Cir. 1987). Theresa voluntarily selected her former attorneys of record, and she cannot

now avoid the consequences of the acts or omissions of her freely-selected attorneys. *Pioneer*

*Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 396-97, 113

S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993); *In re Casey*, 193 B.R. 942, 949 (Bankr. S.D. Cal.

1996). ("Pro se litigants must follow the same rules of procedure that govern other litigants.").

Theresa cannot excuse her failure to comply with statutes and rules by blaming her prior

attorneys, or her inability to find another attorney.

Cross Guns' testimony that Theresa failed to list the investors, and Schultz, who have

claims against her arising from her actions as intermediary in Schultz's investment program, in

her Schedule F, is not controverted. Theresa may amend her Schedules, and liberal amendment

of schedules is allowed as a matter of course at any time before a case is closed under Rule

1009(a). *In re Michael*, 17 Mont. B.R. 192, 198 (9th Cir. 1998) (citing cases). However,

amendment may be denied on a showing of a debtor's bad faith. *Id.*; *In re Magallanes*, 96 B.R.

253, 255-56 (9th Cir. BAP 1988). Thus, Theresa's failure to list her claim filed in the Duncans'

bankruptcy case in her original Schedule B is not excused by her amendment.

Theresa's Schedule J lists, under penalty of perjury, a monthly mortgage payment of

$3,050, but she testified that she has made a total of 3 mortgage payments, and has made none

since 2002, which is the year she signed the note and deed of trust. She has made no mortgage

payments since the date of commencement of this case. Her prior litigation in this Court was

aimed at rescinding the note and mortgage and paying WaMu nothing. Meanwhile, Theresa

continues to live in her house while the creditor entitled to payments under the note and deed of

trust has received nothing since 2002. The first *Leavitt* factor strongly shows bad faith by the Debtor in filing her petition.

The second *Leavitt* factor is the debtor's history of filings and dismissals. Including the instant case, Theresa has filed five bankruptcy cases since 2000, Case Nos. 00-50655-7, 03-61787-13, 04-60156-13, and 05-62798. Case No. 03-61787-13 was filed by Theresa, and dismissed on Theresa's motion after the Chapter 13 Trustee moved to dismiss. Case No. 04-60156-13 was dismissed on the Chapter 13 Trustee's motion, but the Court denied the Trustee's request for dismissal with prejudice and a 6 month bar against refiling. In that case Theresa's Schedule A listed no real property and Schedule D lists no secured creditors, but her Plan listed Long Beach Mortgage as a creditor with an impaired secured claim, and the evidence in this case shows that the note and deed of trust date back to 2002, so her Schedules A and D were false by omission.

Case No. 05-62798 was converted to Chapter 7 on Theresa's motion after WaMu filed a motion for relief from the stay and in rem relief. Theresa waived her discharge, and her claims for relief against WaMu in Adv. No. 05-00128 were dismissed. Each of the latter 3 filings and dismissals took place since 2002, without Theresa making a single mortgage payment. The Court finds the second *Leavitt* factor clearly weighs in favor of a finding of bad faith.

The third *Leavitt* factor is whether the debtor intended to defeat state court litigation. No evidence exists in the record of any state court litigation, but on the other hand Theresa testified that she thought the question on the SOFA called for only those suits and administrative proceedings in which she was a creditor.

JPMorgan's Proof of Claim No. 5 has attached to it a deed of trust granting Long Beach

29

Mortgage Company or assignee[28] a power of sale upon default[29].  In light of Theresa's testimony

that she has not made a mortgage payment since 2002, no reasonable doubt exists that Theresa

filed the instant Chapter 13 case, and her three prior cases, at least in part to prevent the "Loan

Servicer" from exercising its rights under the deed of trust.  Nothing, however, expressly exists

in the record based upon which the Court can make a finding of bad faith under the third *Leavitt*

factor that Theresa intended to defeat state court litigation.

The final *Leavitt* factor is whether egregious behavior is present.  The Court finds that

egregious behavior by Theresa is shown by the evidence admitted in at least four areas.  The first

is Theresa's failure to make any mortgage payments since 2002 while she continues to live in the

house, which is security under the deed of trust.  Her serial filings suggest that she is willing to

refile a bankruptcy petition, without regard to eligibility or her duties under the Code and Rules,

simply to prevent the secured creditor from enforcing its rights under the deed of trust by

operation of the automatic stay under 11 U.S.C. § 362(a).

Only an "honest but unfortunate" debtor is entitled to a "fresh start" under the Bankruptcy

Code.  *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).  The

Court finds that Theresa's treatment of her secured creditor in this and her previous three Chapter

13 filings constitutes abuse of the bankruptcy process.  Theresa seeks dismissal and not

conversion, and her behavior practically guarantees that another petition will follow any effort by

the secured creditor to enforce its rights under the deed of trust if this case is dismissed.  Pursuant

---

[28]The deed of trust includes a provision for the "Sale of Note; Change of Loan Servicer"
on page 5, paragraph 19.

[29]Paragraph 21 of the deed of trust, page 5.

to 11 U.S.C. § 105(a), the bankruptcy court is authorized to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title .... or to prevent an abuse of process." *Missoula Fed. Credit Union v. Reinertson (In re Reinertson)*, 241 B.R. 451, 455, 18 Mont. B.R. 72, 77 (9th Cir. BAP 1999). The Court will prevent any further abuse of the bankruptcy process by this Debtor.

The second area of egregious behavior by Theresa shown by the evidence is her participation in Schultz's investment program, which resulted in no profit and hundreds of thousands of dollars of losses by Schultz's investors, who were located and referred to him by Theresa. Theresa argues that she was careful to not give investment advice but only acted as an "intermediary," but the record shows that the state auditor joined Theresa in an action alleging violations of state securities laws. Theresa argues that she was once licensed, but that is irrelevant in light of her testimony that she let her license lapse. Cross Guns testified that the CRD showed Theresa as unlicensed to be an investment advisor, and the Court finds that Theresa's participation in the fraudulent investment scheme constitutes egregious behavior evidencing bad faith.

The third area of egregious behavior by Theresa is her tender of Hardin's bogus bonded promissory notes in full payment of the mortgage. That tender is not ameliorated by her later withdrawal of the note prior to the hearing. Theresa is grasping at straws in her efforts to deprive the secured creditor of its rights against her home under the deed of trust, and her participation with Hardin in peddling bogus instruments demonstrates desperation, and egregious behavior, which the Court is obligated to stop.

The fourth area of egregious behavior by Theresa is shown by her performance in filing

31

her tax returns.  The Court specifically, and at length, admonished Theresa at hearing about her duty to assume the burdens of the Bankruptcy Code and Rules in order to enjoy the benefits of bankruptcy relief, including the need for her to file all her state and federal tax returns.  Theresa submitted unsigned and undated tax returns for several years to the DOR, and only after being specifically ordered by the Court did she deliver returns to the DOR in compliance.

The IRS has filed a proof of claim stating that Theresa failed to file federal income tax returns for several years.  Subsequently Theresa filed a motion (Docket No. 114) which states that she has filed both her federal and state income taxes.  To date the IRS has not filed an amended claim.  Theresa's failure to comply with her obligations under state and federal tax law lasted several years, and it is uncertain even now whether she is in compliance.  The Court finds this behavior egregious.  In sum, the fourth *Leavitt* factor strongly shows egregious behavior and bad faith by the Debtor in filing her petition.

Three of the four *Leavitt* factors show bad faith by the Debtor in filing her petition.  The Court finds that Theresa's conduct satisfies the *Marrama* requirement that it be "atypical."  127 S.Ct. at 1112 n.11; *Rosson*, 545 F.3d at 773.  After considering the totality of the circumstances the Court concludes that Theresa filed her petition in bad faith.  What remains to be determined is the remedy.

"A dismissal with prejudice bars further bankruptcy proceedings between the parties and is a complete adjudication of the issues."  *Leavitt*, 171 F.3d at 1223-24; *In re Tomlin ("Tomlin")*, 105 F.3d 933, 936-37 (4th Cir. 1997).  In *Tomlin* the United States Court of Appeals for the Fourth Circuit describes a dismissal order that bars subsequent litigation as a "severe" and "drastic" sanction which is limited to "extreme situations":  "Generally, only if a debtor engages

32

in egregious behavior that demonstrates bad faith and prejudices creditors – for example,
concealing information from the court, violating injunctions, or filing unauthorized petitions –
will a bankruptcy court forever bar the debtor from seeking to discharge then existing debts."
*Tomlin*, 105 F.3d at 937 (citing cases).

The evidence shown in the record, after two hearings, shows egregious behavior required
not only for a finding of bad faith under the fourth *Leavitt* factor, but also for dismissal with
prejudice barring further bankruptcy proceedings. *Leavitt*, 171 F.3d at 1223-24. However, the
Trustee and U.S. Trustee seek conversion to Chapter 7 and not dismissal, contending that it is in
the best interests of creditors for a trustee in Chapter 7 to be able to investigate the Debtor's
financial affairs and possibly pay creditors. The Court agrees, and further finds that it is in the
best interests of creditors to convert the case to Chapter 7 in order to prevent abuse of the
bankruptcy process by this Debtor, by retaining jurisdiction in order to compel the Debtor's
compliance, and to prevent the Debtor from filing another bankruptcy petition and invoking
another automatic stay to frustrate a legitimate secured creditor's efforts to enforce its rights
under a deed of trust[30].

## CONCLUSIONS OF LAW

1. This Court has exclusive jurisdiction in this bankruptcy case under 28 U.S.C. §
1334(a).

2. The Debtor's motions to dismiss and the motions to convert the case to Chapter 7 filed
by the Chapter 13 Trustee and Office of U.S. Trustee are core proceedings under 28 U.S.C. §

---

[30]Nothing herein prevents Theresa from exercising her rights under nonbankruptcy law to
refinance or pay off the obligation to the secured creditor.

157(b)(2).

3.   A debtor's right to dismiss a Chapter 13 case under 11 U.S.C. § 1307(b) is not absolute, but is qualified by an implied exception for bad-faith conduct or abuse of the bankruptcy process.  *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 767, 773-74 (9th Cir. 2008); *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007).

4.   The Trustee and U.S. Trustee satisfied their burden of proof to show by a preponderance of the evidence that the Debtor Theresa Chabot filed her Chapter 13 bankruptcy petition in bad faith, and her filing is an abuse of the bankruptcy process.

5.   The bankruptcy court has equitable powers under 11 U.S.C. § 105(a) to prevent an abuse of the bankruptcy process.

6.   Cause exists to convert this case to Chapter 7, and conversion of this case to a case under Chapter 7 is in the best interests of creditors and the estate under 11 U.S.C. § 1307(c).

**IT IS ORDERED** a separate Order shall be entered in conformity with the above denying the Debtor's motions to dismiss (Docket Nos. 21 and 127); granting the motions to convert filed by the Chapter 13 Trustee and U.S. Trustee (Docket Nos. 20, 47, 85) and converting this case to a case under Chapter 7 of the Bankruptcy Code.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

34